

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 1, 2020

**BY ECF**
Honorable Andrew L. Carter, Jr.
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007

    Re:   *United States v. Malik Hawkins*, 19 Cr. 846 (ALC)

Dear Judge Carter:

    The Government respectfully submits this letter in opposition to the defendant's motion for bail, dated March 30, 2020 (Dkt. No. 67 ("Mot.")). The defendant's reliance on the current health crisis to secure his release—especially after recently having his bail revoked for repeated and serious violations of his conditions of release—is unfounded and should be denied. As set forth below, the defendant cannot demonstrate the circumstances necessary to justify his release based upon his generalized assertions regarding the current COVID-19 pandemic.

## I. Background and Procedural History

    On November 21, 2019, twelve defendants were indicted for their participation in a widespread crack distribution ring that operated in the vicinity of the AK Houses complex located at 128th Street in Harlem, Manhattan ("the AK Houses Crew"). As alleged in the above-referenced Indictment (the "Indictment"), the AK Houses Crew controlled the distribution of crack cocaine within a several block radius in Harlem, and enforced its territory through threats of violence, and the use of firearms to inflict actual violence. Defendant Malik Hawkins, who is confined to a wheelchair as a result of a shooting,[1] was an integral part of the AK Houses Crew. As alleged in the Indictment, Hawkins was a street level drug dealer working for the Crew who also facilitated the sale of firearms for the group. He is charged with participating in a conspiracy to distribute over 280 grams of crack, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), and using and carrying firearms in furtherance of the drug conspiracy, in violation of 18 U.S.C. § 924(c). Hawkins faces a mandatory minimum term of imprisonment of 15 years as a result of the charged offenses.

    Following the arrest of six of Hawkins's co-defendants on December 11, 2019, the Indictment was unsealed. Hawkins remained a fugitive and was at large for over a month. The New York City Police Department ("NYPD") and the United States Marshals Service located Hawkins and apprehended him on January 24, 2020.

---

[1] It is believed that Hawkins lost the use of both legs and has limited mobility in one hand after he was shot.

At his presentment, the Government proffered that, in the course of the investigation, Hawkins was captured in multiple videos selling crack on the street in his wheelchair, including NYPD recordings of sales to undercover police officers. In addition, the Government has text messages and other communications from Hawkins in which he offered to sell firearms, displaying pictures of guns and discussing prices. The Government's evidence also includes a video on social media that shows Hawkins—following an encounter with law enforcement—bragging that the cops always search me but "they never find that thing [*i.e.*, his gun]." In addition, despite being only 26, Hawkins has four prior convictions in New York, including felony criminal possession of a controlled substance (2013), felony criminal possession of a loaded weapon (2013), and felony robbery (2013).

Chief Magistrate Judge Gabriel W. Gorenstein ultimately granted bail over the Government's objection—but noted that this is a presumption case, and stated that if Hawkins were not confined to a wheelchair, he would have detained Hawkins. Hawkins was released on a $50,000 personal recognizance bond, signed by two responsible co-signers, and subject to electronic monitoring.

About one month later, on or about March 2, 2020, Hawkins's Pretrial Services Officer issued a memorandum documenting a number of bail violations by Hawkins. Among other things, Hawkins, who was on home incarceration with GPS monitoring, had left home for unauthorized reasons most mornings and afternoons after supervision commenced. Further, on January 29, 2020, Hawkins tested positive for marijuana use. Thereafter, despite multiple warnings, the GPS monitoring equipment reported an additional <u>32</u> unauthorized leave events between February 4 and February 28, 2020. On February 18, 2020, Hawkins admitted to Pretrial Services additional instances of marijuana use. And, on February 21, 2020, the defendant was arrested by the NYPD for a domestic violence incident involving his girlfriend, in which Hawkins allegedly bit her right ring finger and punched her in the face with a closed fist. An order of protection was issued against Hawkins.

On March 9, 2020, Magistrate Judge Ona T. Wang held a bail revocation hearing, at the conclusion of which Hawkins was remanded into custody in light of his repeated bail violations. Later that day, the Deputy United States Marshal processing the intake of Hawkins reported to this Office that on Hawkins's person and in his wheelchair, the Marshals recovered tobacco, marijuana, and a small razorblade type knife, all of which Hawkins had brought into the federal courthouse at 500 Pearl Street with him for the bail revocation hearing.[2]

The defendant has now been detained in the Metropolitan Detention Center ("MDC") for approximately 20 days.

---

[2] The Marshals took photographs of the contraband and weapon secreted on Hawkins and in his wheelchair, and provided the photographs to this Office.

## II.   Discussion

Under the Bail Reform Act, a defendant shall be detained pending trial if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  The Government bears the burden of proof as to risk of flight by a preponderance of the evidence, and as to danger to the community by clear and convincing evidence.  18 U.S.C. § 3142(f); *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007).  Where, as here, the charges include controlled substance offenses with a maximum term of imprisonment of ten years or more and/or use of a firearm in furtherance of such an offense in violation of 18 U.S.C. § 924(c)—and both types of offenses are charged in this case—a rebuttable presumption arises that there are no conditions that will reasonably assure the defendant's appearance and the safety of the community.  18 U.S.C. § 3142(e)(3).  To the extent the defendant's motion can be construed as an appeal of Magistrate Judge Wang's detention order, a district court reviews *de novo* a magistrate judge's decision to release or detain a defendant pending trial.  *Gotti v. United States*, 358 F. Supp. 2d 280, 283 (S.D.N.Y. 2005); *see also United States v. Leon*, 766 F.2d 77, 80 (2d Cir 1985)

Where, as here, a defendant has been ordered detained pending trial, the "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of the United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."  18 U.S.C. § 3142(i).  Courts in this District and elsewhere have recognized, specifically in the context of the COVID-19 pandemic, that the determination of whether there is a "compelling reason" for a defendant's temporary release under this provision requires the court to "balance the reasons advanced for such release against the risks [of danger to the community and/or flight] that were previously identified and resulted in an order of detention.  In turn, whether temporary release under § 3142(i) is proper requires the individualized analysis of the facts of each case."  *United States v. Chambers*, 20 Cr. 135, Dkt. No. 70 (S.D.N.Y. Mar. 31, 2020) (Furman, J.); *United States v. Conley*, 19 Cr. 131, Dkt. No. 366 (S.D.N.Y. Mar. 31, 2020) (Engelmayer, J.).

The defendant's application falls well short of providing any basis for releasing him.  The defendant is a danger to this community and a flight risk.  The defendant has prior criminal convictions involving drugs, robbery, and the use of a firearms.  He was a core member of a large-scale crack distribution ring, and sold guns in furtherance of his drug dealing.  After the Indictment charging Hawkins was unsealed and numerous of his co-conspirators had been arrested, Hawkins remained a fugitive from justice for more than a month.  While on pretrial supervision, Hawkins demonstrated utter disregard for judicial authority, repeatedly violating his conditions of release—which included home incarceration and electronic monitoring—by leaving his residence on virtually a daily basis, using drugs, and allegedly attacking his girlfriend.  Then, the defendant showed up to his *bail revocation hearing* in the federal courthouse at 500 Pearl Street with drugs and a *knife* concealed on his person and in his wheelchair.  Chief Magistrate Judge Gorenstein made clear that Hawkins's being confined to a wheelchair was the sole reason for releasing him on bail; as it turns out, Hawkins used his wheelchair as a vehicle for storing contraband.  Less than a month ago, Hawkins was found by Magistrate Judge Wang to have left his house without authorization in excess of 32 times in a one month period while on pretrial release; now, there simply is no basis to accept the defense's unsupported assertion that Hawkins can somehow

"assure the Court that he will be where he is required to be at all times without contact with anyone beyond his household." Mot. at 2, n.1. In light of these facts, the defendant cannot—and indeed his application does not even attempt to—rebut the presumption that he poses both a danger and a risk of flight.

Instead, the defendant's application suggests that "temporary release" is warranted based on generic arguments relating to the COVID-19 pandemic. The Government construes the application to seek such temporary release pursuant to 18 U.S.C. § 3142(i), although neither that section nor any other provision of the Bail Reform Act is cited in the application. The defendant fails to assert, much less make any showing, that he would be released into "the custody of the United States marshal or another appropriate person," as required by § 3142(i). In any event, the defendant's motion fails to identify any "compelling reason" warranting his release, particularly in light of the risk of danger and flight that he poses. The defendant relies primarily on suppositions regarding the COVID-19 health pandemic—and the supposed inability of the Bureau of Prisons ("BOP") or the MDC to respond to the spread of COVID-19—as purportedly sufficient grounds to grant his release. The defendant fails to proffer any evidence supporting those suppositions, and his bail application should be denied.

As an initial matter, the argument that the defendant might contract COVID-19 at the MDC is not a permissible basis for release from custody under the Bail Reform Act. That is because the Bail Reform Act "addresses conditions of release, not conditions of *detention*," *United States v. Valerio*, 9 F. Supp. 3d 283, 293-94 (E.D.N.Y. 2014), and COVID-19 does not have "a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of [the defendant] person as required and the safety of any other person and the community," 18 U.S.C. § 3142(f)(2), which must be considered in assessing whether there is any compelling reason warranting temporary release.

In any event, the defendant's arguments regarding COVID-19 are speculative, and do not warrant release. *First*, the defendant implies that the MDC cannot appropriately handle the COVID-19 pandemic. But the BOP generally, and the MDC specifically, is prepared to handle the risks presented by COVID-19. The BOP has implemented national measures to mitigate the spread of COVID-19 within prisons. *See Federal Bureau of Prisons COVID-19 Action Plan*, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. The Government has been informed by the BOP that it is prepared to handle the risks posed by COVID-19, as with other infectious diseases and other medical conditions. Since at least October 2012, BOP has had a Pandemic Influenza Plan in place. *See BOP Health Management Resources*, available at https://www.bop.gov/resources/health_care_mngmt.jsp.[3] Moreover, beginning approximately two months ago, in January 2020, BOP began to plan specifically for coronavirus/COVID-19 to ensure the health and safety of inmates and BOP personnel. *See Federal Bureau of Prisons*

---

[3] *See also Module 1: Surveillance and Infection Control*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf; *Module 2: Antiviral Medications and Vaccines*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_2.pdf; *Module 3: Health Care Delivery*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf; *Module 4: Care for the Deceased*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_4.pdf.

*COVID-19 Action Plan*, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. As part of its Phase One response to coronavirus/COVID-19, BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id*. In addition, BOP stood up "an agency task force" to study and coordinate its response to coronavirus/COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President. BOP's planning is structured using the Incident Command System (ICS) framework." *Id.*

On March 13, 2020, the BOP, in coordination with the Department of Justice and the White House, implemented its Phase Two response "in order to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id*. BOP's national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.* For example, BOP (a) suspended social visits for 30 days (but increased inmates' access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmates' movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id*.

As part of the BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined"; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id*. Additionally, staff members and contractors are screened upon entry, which entails taking each individual's temperature, asking each individual a series of health-related questions, and denying entrance to the institution by anyone that poses a health risk. Inmates exhibiting flu-like symptoms are separated from the general population and tested for COVID-19 in accordance with local health authority protocols.

These and other measures—including the distribution of soap and other hygiene items to inmates within the MDC—were outlined in a March 18, 2020 letter from the BOP to Chief Judge Colleen McMahon in response to questions regarding the MDC's institutional responses to COVID-19. Furthermore, with respect to the small number of inmates at MDC who have tested positive for COVID-19—just a single inmate as of March 31, 2020—the Government understands that the facility has taken responsive steps, including appropriately quarantining and cleaning the unit where the inmate resided, moving the inmate out of the unit where he was previously housed, and conducting a medical assessment of all inmates in that unit, which will be repeated regularly to monitor those inmates and identify those who may require medical attention. As detailed above, the MDC's swift action in taking appropriate mitigating measures, further undermine the defendant's claims that the MDC is ill-prepared to manage COVID-19. Indeed, with over 75,000

cases in the state of New York, and new cases increasing at an exponential rate, the virus appears to be spreading much faster outside the prison walls than inside the MDC.

*Second*, while the BOP and the MDC have in place a plan to address all potential health issues, it is notable that the defendant has not alleged that he falls within any "high-risk" category with respect to COVID-19. The defendant is 26 years old. He is wheelchair-bound, but that is a permanent condition that he has lived with for many years. He does not claim to suffer from any underlying chronic health issues or immunodeficiency other than sores from his wheelchair, and therefore he does not have any condition that would appear to place him at higher risk of contracting the virus. *See* Centers for Disease Control, Coronavirus Disease 2019 (COVID-19), *Are You at Higher Risk for Severe Illness?*, available at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html. To the extent that Hawkins may have received inadequate care for issues relating to him being wheelchair-bound, as he claims, the Government has no objection to an appropriate medical order issuing to address his complaints regarding bed sores and open wounds—but those complaints do not place Hawkins at a higher risk for COVID-19, and do not support release.

*Third*, courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be warranted. *United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008); *see also United States v. Hunter*, 13 Cr. 521 (LTS), 2014 WL 6632965, at *2 (S.D.N.Y. Nov. 24, 2014) (noting that appropriate bail considerations must "implicate the core issues of flight risk and danger to the community"); *United States v. Nelson*, 18 Cr. 044 (RJA) (HKS), 2018 WL 2928034, at *4 (W.D.N.Y. June 12, 2018) (reasoning that while "[t]he Court is sympathetic" to the defendant's poor health and "understands that it is more difficult for the Defendant to obtain appropriate medical treatment in prison," "[t]he Court is not persuaded that the Defendant's poor health has any significant bearing on the potential danger his release would pose"). Thus, while certain extreme medical circumstances may justify a highly circumscribed release, no such extreme circumstances are present here.[4]

Indeed, there is a growing body of decisions in this District rejecting applications for bail based on assertions relating to COVID-19. *See, e.g.*, *United States v. Bradley*, 19 Cr. 632

---

[4] By way of further illustration, in a case where a defendant's medical condition warranted pretrial release from detention, the defendant faced a terminal illness, could only receive necessary life-prolonging treatment if released, and was awaiting trial. *See United States v. Scarpa*, 815 F. Supp. 88, 89 (E.D.N.Y. 1993), supplemented (Mar. 5, 1993). In *Scarpa*, the defendant was granted pretrial release when it was found that he was terminally ill with AIDS and his medical condition could not be managed appropriately by prison medical facilities. The court noted that the defendant could receive "necessary and humane treatment *only* under care of his physician," and had "entered the final stages of this fatal illness." *Id.* (emphasis added). Even in those extreme circumstances—where the defendant's illness had actually manifested—release was conditioned on the defendant's "confine[ment] to Beekman Hospital under the 24-hour guard of the United States Marshal's Service at [defendant's] own expense." *Id.* at 89, 92. *Scarpa* further demonstrates why the current situation does not even begin to approach the type of extraordinary circumstance that could warrant relief.

(S.D.N.Y. Mar. 25, 2020) (Daniels, J.) (denying bail application for inmate detained in MCC on controlled substances and firearm charges who had recently experienced a stroke and had high blood pressure); *United States v. Rivera*, 20 Cr. 6 (S.D.N.Y. Mar. 25, 2020) (Rakoff, J.) (denying bail application for inmate detained in MCC on controlled substance charge who had a childhood history of asthma); *United States v. White*, 19 Cr. 536 (S.D.N.Y. Mar. 25, 2020) (Castel, J.) (denying bail application for inmate detained at Valhalla on controlled substance and Hobbs Act charges with history of whooping cough); *United States v. Alvarez*, 19 Cr. 622 (S.D.N.Y. Mar. 24, 2020) (Cote, J.), ECF No. 17 (denying bail application for inmate detained in MCC on controlled substances charges who had been diagnosed with Hepatitis B); *United States v. Acosta*, 19 Cr. 848 (S.D.N.Y. Mar. 25, 2020), Dkt. No. 14 (Buchwald, J.) (denying bail application for inmate detained in MCC that, precisely as in this case, "reli[ed] mainly on a form letter proffering general reasons to release inmates because of the spread of the COVID-19 virus"); *United States v. Bonafe*, 19 Cr. 862 (S.D.N.Y. Mar. 26, 2020) (Caproni, J.), Dkt. No. 108 (denying bail application for inmate charged with racketeering, narcotics, and firearms offenses who argued that his detention put him at risk of infection and hindered his ability to prepare his defense); *United States v. Chambers*, 20 Cr. 135 (S.D.N.Y. Mar. 31, 2020) (Furman, J.) (denying pretrial bail for inmate diagnosed with asthma); *United States v. Wade*, 19 Cr. 875 (S.D.N.Y. Mar. 27, 2020), Dkt. No. 32 (Swain, J.) (denying bail application for inmate detained in MCC who suffers from asthma and finding that the defendant "clearly presents a danger to the public that is neither negated nor overcome by the COVID-19 risk"); *United States v. Sanchez-Reyes*, 19 Cr. 502 (S.D.N.Y. Mar. 30, 2020) (Cote, J.) (denying bail application from inmate at MCC based on COVID-19 where, as here, the application relied on generic arguments about the risks posed by COVID-19 and did not assert any underlying health condition). As the foregoing citations make clear, the defendants in many of these cases asserted underlying health conditions that purportedly placed them at heightened risk with respect to COVID-19, and the court still denied their applications. The defendant in this case cannot even point to any such underlying health condition, further highlighting the generic, and wholly meritless, nature of his application.

At most, the defendant has raised the medical issue of bedsores, and offers speculation that the BOP would be unable to attend to any additional adverse health consequences *if* they arose. These are not compelling reasons justifying his release. Furthermore, given the current unprecedented circumstances caused by COVID-19, the ability of Pretrial Services to effectively supervise the defendant if he were to be released pending sentencing likely would be curtailed as officers' ability to travel and visit with the defendant could be limited, and the resources of Pretrial Services are otherwise stretched.[5] In sum, the defendant's speculative arguments regarding COVID-19 are no basis to release the defendant pending trial. The defendant has not rebutted the presumption that he poses a danger and a flight risk, and over the past couple months, has clearly demonstrated that he is not suited to supervision. His generic arguments based on the current health crisis do not warrant release.

---

[5] That is particularly true given this defendant's demonstrated disregard for the authority of Pretrial Services. Indeed, Pretrial Services' violation report is replete with references to home visits that were made to Hawkins's home, and repeated warnings by Pretrial Services that were simply ignored by Hawkins.

### III. Conclusion

For the reasons set forth above, the defendant's application for bail should be denied.

                                    Respectfully submitted,

                                    GEOFFREY S. BERMAN
                                    United States Attorney

                              By: /s/   *Louis Pellegrino*
                                    Juliana N. Murray / Louis A. Pellegrino
                                    Assistant United States Attorneys
                                    (212) 637-2314 / -2617

cc: Bobbi C. Sternheim, Esq. (via ECF)